# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATURAL RESOURCES DEFENSE
COUNCIL, INC.
40 West 20th Street, 11th Floor
New York, NY 10011

AMERICAN ASSOCIATION OF
ZOOLOGICAL PARKS AND
AQUARIUMS INC. d/b/a Association of Zoos
& Aquariums
8403 Colesville Road, Suite 710
Silver Spring, MD 20910
(Montgomery County)

CENTER FOR BIOLOGICAL DIVERSITY
378 N. Main Avenue
Tucson, AZ 85701

HEALTHY GULF
1010 Common Street, #902
New Orleans, LA 70112

SURFRIDER FOUNDATION
942 Calle Negocio, Suite 350
San Clemente, CA 92673

                    *Plaintiffs*,

        v.

JANET COIT,
in her official capacity as
Assistant Administrator for Fisheries,
National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910
(Montgomery County)

No.       21-cv-01827

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, MD 20910
(Montgomery County)

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
1401 Constitution Avenue, NW, Room 5128
Washington, DC 20230

GINA RAIMONDO, in her official capacity
as Secretary of Commerce,
United States Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

BUREAU OF OCEAN ENERGY
MANAGEMENT
1849 C Street, NW
Washington, DC 20240

AMANDA LEFTON,
in her official capacity as Director,
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240

DEB HAALAND,
in her official capacity as Secretary of the
Interior,
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

                                    *Defendants.*

## INTRODUCTION

1.      This case arises from the federal government's approval of seismic airgun surveys that will "take"—that is, disturb, injure, and even kill—countless marine mammals and other protected ocean species, some already on the brink of extinction. These federal approvals violated the Endangered Species Act, Marine Mammal Protection Act, and National Environmental Policy Act, and flouted the Administrative Procedure Act's standards for reasoned agency decision-making.

2.      The ocean is an acoustic world. Sound travels far more efficiently underwater than through the air, and whales, dolphins, and other marine mammals depend on sound to find mates, forage, avoid predators, navigate, and communicate— in short, for virtually every life function. These animals are acutely sensitive to acoustic disturbance.

3.      The oil and gas industry uses seismic airgun surveys to locate fossil fuel deposits beneath the ocean floor. These surveys typically deploy arrays of airguns, which are towed behind ships across broad swaths of the ocean. While seismic surveys are useful for oil and gas prospecting, they have devastating impacts on marine life.

4.      Seismic airgun arrays fire intense blasts of energy into the water about every 10 to 12 seconds for days, weeks, or months at a time depending on the length of the survey. A large seismic array can produce effective levels of sound—above 250 decibels—greater than that of virtually any other man-made source, save explosives. These noise blasts penetrate deep into the seafloor and rebound to the surface for analysis.

1

5.      At close range, the intensity of the energy blasts fired from seismic airgun arrays can kill or physically injure marine life. The sound then radiates outward and is so powerful that it can still be heard thousands of miles away. Seismic surveys can therefore disrupt entire acoustic habitats, masking sound signals and interfering with behaviors that are essential to marine species' feeding, mating, and rearing of young.

6.      In the Gulf of Mexico, seismic surveys are the dominant source of noise pollution, particularly in the low frequencies that are crucial for baleen and sperm whales. Due in substantial part to these surveys, ambient noise levels in the Gulf are among the highest measured anywhere on earth.

7.      At the core of this case is the government's failure to satisfy its duties, under multiple statutes, to assess, minimize, and prevent unlawful harm from this highly disruptive activity.

8.      In March 2020, the National Marine Fisheries Service ("the Service") issued a Biological Opinion under the Endangered Species Act (ESA) that found that anticipated seismic surveys in the Gulf of Mexico would contribute to the extinction of the endangered Gulf of Mexico Bryde's whale, of which only about 50 individual whales remain. Despite that conclusion, the Service then arbitrarily decided that minor mitigation measures—measures that would not reduce the number, location, or intensity of seismic surveys in any way—would nevertheless eliminate the extinction risk. This unexplained conclusion did not follow from the Service's own factual findings, violated the Administrative Procedure Act's standards for reasoned agency decision-making, and contravened the Service's unequivocal statutory duty to assist

2

federal agencies in "insur[ing] that [their actions] [are] not likely to jeopardize the continued existence of any endangered species," 16 U.S.C. § 1536(a)(2), (b).

9.      In January 2021, the day before a new administration took office, the Service published a rule ("the Seismic Rule") that authorizes harm from five years of seismic airgun blasting in the Gulf of Mexico under the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1361 *et seq.* 86 Fed. Reg. 5322 (Jan. 19, 2021). The extent of harm allowed under the Seismic Rule is enormous. Under the rule, multiple airgun surveys may traverse the Gulf, on average, every hour of every day for the next five years, disrupting and in some cases injuring marine mammals more than eight *million* times over that period.

10.      The MMPA allows the Service to authorize the "incidental" take of "small numbers" of marine mammals only if certain conditions are met. 16 U.S.C. § 1371(a)(5)(A)(i). Among other requirements, the incidental take must have no more than a "negligible impact" on marine mammal species or populations. *Id.* And the Service must require mitigation to minimize the impact to the species and their habitat to the "least practicable" level. *Id.* The Service violated those standards, authorizing the "take" of up to one-third of each species during each survey. The Service rested that decision on an unscientific surmise that the taking of a third of any species is a "small" number. The Service then compounded that error by failing to evaluate potentially practicable mitigation measures. For several of the Gulf's marine mammals, including the endangered Gulf of Mexico Bryde's whale, the authorized harm will not be "negligible." *See id.* It will be devastating.

3

11.     The Service and the Bureau of Ocean Energy Management also violated the National Environmental Policy Act (NEPA) by relying on an outdated environmental impact statement (EIS). NEPA "requires that [an] agency take a 'hard look' at environmental impacts before taking major actions." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). Here, the Service and the Bureau failed to update their analysis—which by the time of their decisions was years old—to include the Service's own ESA finding that the agencies' actions would contribute to the potential extinction of the Gulf of Mexico Bryde's whale. These agencies also violated NEPA by failing to address the presence of Gulf of Mexico Bryde's whales in areas of the Gulf where the Service and the Bureau intend to authorize nearly unrestricted seismic blasting. "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgment of potential environmental harms." *Id.* at 187 (citation omitted). The agencies' efforts here "fell short in both regards." *Id.*

12.     These government actions are unlawful and threaten to unnecessarily harm hundreds of thousands of marine mammals.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (Administrative Procedure Act). The relief sought is authorized by 28 U.S.C. § 2201(a) (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 706(2) (vacatur).

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (e)(1)

because Defendant Janet Coit, in her official capacity as Assistant Administrator for Fisheries, has her office in this District; Defendant National Marine Fisheries Service's headquarters are located in this District; Plaintiff American Association of Zoological Parks and Aquariums Inc. resides in this district (and no real property is involved in this action against agencies and officers of the United States); and a substantial part of the events and omissions which gave rise to this action occurred in this District, including:

 a. The Biological Opinion and Seismic Rule were signed by Donna Wieting and Samuel D. Rauch III, respectively, Service officials who work at the Service's headquarters office in Silver Spring, Maryland, in this District;

 b. The Service was a consulting agency on the NEPA review led by the Bureau, and the Final Programmatic Environmental Impact Statement was reviewed by Service staff and adopted by the Service as the NEPA document for the Seismic Rule in this District;

 c. A substantial portion of the work in preparing, reviewing, and approving these agency actions was done by those and other Service officials and staff at the Silver Spring headquarters office in this District;

 d. The Seismic Rule was prepared by the Service in this District, and the Service's "consultation lead" for the Biological Opinion was based in this District;

 e. The Service's review and approval of the Final Programmatic Environmental Impact Statement was conducted in this District by Service and National

Oceanic and Atmospheric Administration (NOAA) officials, including Vicki

Wedell, NOAA's then-acting Chief of the Policy and Planning Division;

f.   The administrative records for the Seismic Rule and for the Biological

Opinion are located in this District; and

g.   Documents in the Service's possession that are part of the administrative

record for the Service's review and approval of the Programmatic

Environmental Impact Statement, and for its adoption of the Programmatic

Environmental Impact Statement as a NEPA document for the Seismic Rule,

also are located in this District.

## PARTIES

**I.   Plaintiffs**

15.   Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a nationwide

nonprofit environmental organization. NRDC has over 400,000 members nationwide.

NRDC's mission is to "safeguard the Earth: its people, its plants and animals, and the

natural systems on which all life depends." For more than two decades, NRDC has

worked to protect marine mammals and other wildlife from the harmful effects of ocean

noise.

16.   NRDC members derive recreational, conservation, aesthetic, and other

benefits from the ecosystems and species of the Gulf of Mexico and its coastline,

including marine mammals in the Gulf of Mexico.

17.   For example, one NRDC member, Bonny Schumaker, who is also a

member of Plaintiff Healthy Gulf, regularly visits the Gulf of Mexico and enjoys seeing

or seeking marine wildlife, including the Gulf of Mexico Bryde's whale and sperm whale. Ms. Schumaker is a pilot who routinely flies over the Gulf—including over the habitat for the Bryde's whale and other marine mammals—along with scientists and other observers to locate, photograph, and document the presence of marine mammals and other wildlife. She has done so for over a decade. Ms. Schumaker's work supports conservation efforts and scientific research. Ms. Schumaker plans to continue regular flights during the next 12 months and for the foreseeable future thereafter over the northeastern Gulf and the habitat of the Gulf of Mexico Bryde's whale and sperm whale, and to look for and attempt to see these species, as well as other marine mammals such as bottlenose dolphins.

18.     Plaintiff American Association of Zoological Parks and Aquariums Inc., d/b/a Association of Zoos & Aquariums, (Association of Zoos and Aquariums or AZA) is a 501(c)(3) nonprofit organization dedicated to the advancement of zoos and aquariums in the areas of conservation, education, science, and recreation. AZA represents more than 240 facilities in the United States and overseas, including facilities along the Gulf of Mexico, which collectively draw more than 200 million visitors every year and are leaders in conservation education. AZA-accredited zoos and aquariums dedicate millions of dollars annually to conduct scientific research, conservation, and education programs, including programs for marine mammal conservation in waters affected by Defendants' actions. AZA members engage with other key stakeholders to redress the harm to endangered or threatened species injured, stranded, or otherwise harmed in coastal waters off the United States. AZA's members intend to continue to do

7

so in the months and years ahead. AZA's headquarters and principal place of business is located in Silver Spring, Montgomery County, Maryland.

19.     Plaintiff Center for Biological Diversity is a nonprofit organization that works to protect wildlife, including endangered species and their habitats. The Center has more than 84,000 members who are dedicated to environmental conservation. The Center has longstanding interests in marine mammals, endangered species, and their habitat. Toward these interests, the Center has engaged in advocacy and actions to protect marine habitat from the adverse impacts of offshore oil and gas activities. The Center has worked to protect Gulf of Mexico wildlife—sperm, Bryde's, and Cuvier's beaked whales; manatees; bottlenose dolphins; loggerhead, Kemp's Ridley, and leatherback sea turtles; bluefin tuna; oceanic whitetip shark; smalltooth sawfish; and numerous corals. The Center has members who appreciate and benefit from these animals and their habitat for viewing, photography, recreation, research, and personal enjoyment. For example, the Center has a member who regularly visits the Gulf of Mexico to enjoy marine wildlife. They go to the Gulf of Mexico to observe manatees, whales, and other marine mammals. This member works to advocate for wildlife protections from threats such as fisheries, oil and gas development, pollution, and habitat destruction. Additionally, the Center's member has a strong interest in conserving sea turtles, often visiting Gulf sea turtle habitat and nesting beaches.

20.     Plaintiff Healthy Gulf is a nonprofit network of community, conservation, environmental, and fishing groups and individuals committed to protection and restoration of the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to

8

collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida, and Madison, Mississippi. Healthy Gulf members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, as well as other states.

21.     Healthy Gulf members and constituents, including member Bonny Schumaker, regularly use, enjoy, and benefit from the marine environment of the Gulf of Mexico. Healthy Gulf members benefit from the presence of the Gulf's marine mammal species and their marine environment for recreational, aesthetic, commercial, scientific, and environmental purposes, including sailing, whale-watching, scientific study, boat touring, underwater diving, fishing, and photography. The ability of Healthy Gulf's members to pursue these interests is contingent on the continued existence and wellbeing of marine mammal populations in the Gulf of Mexico.

22.     Plaintiff Surfrider Foundation (Surfrider) is a nonprofit organization dedicated to the protection and enjoyment of the world's oceans, waves, and beaches. Surfrider has more than 350,000 supporters and members, 79 local chapters, and 92 school clubs in the United States, and maintains five local chapters on the Gulf coast. Surfrider's members look for, study, and enjoy marine species in the Gulf, including Gulf of Mexico Bryde's whales, sperm whales, and beaked whales. Surfrider's members derive recreational, aesthetic, and economic benefits from the ocean in the Gulf of Mexico and the diverse marine life that resides there, including marine species that are

9

likely to be harmed by seismic surveys. For example, Surfrider has members who visit the Gulf along the Texas coast often, mostly to surf, but also to fish. An essential part of those activities includes observing and experiencing the Gulf's marine life, including dolphins that are frequently in the same waters.  Surfrider's members' future use and enjoyment of Gulf waters depends on healthy and sustainable populations of marine mammals and other marine life.

23.     Plaintiffs and their members derive significant benefits—recreational, aesthetic, economic, cultural, or scientific—from marine mammals in the Gulf of Mexico and their ecosystems. Defendants' failure to comply with federal law and the resulting harm to the marine environment, including the disturbance, injury, and death of marine mammals and other marine life, adversely and irreparably harms the interests of Plaintiffs and their members, and continues to do so.

24.     Plaintiffs' and Plaintiffs' members' injuries will be redressed by the relief they request, as that relief would undo or reduce the causes of those injuries. Plaintiffs have no other adequate remedy at law.

## II.     Defendants

25.     Defendant Janet Coit, as Assistant Administrator for Fisheries, is the highest-ranking official within the National Marine Fisheries Service and, in that capacity, has responsibility for the administration and implementation of the MMPA and of the ESA with regard to marine species, and for compliance with all other federal laws applicable to the Service. Assistant Administrator Coit works out of the Service's headquarters office in Silver Spring, Montgomery County, Maryland. She is sued in her

10

official capacity.

26.     Defendant National Marine Fisheries Service is a federal agency within the National Oceanic and Atmospheric Administration in the Department of Commerce. The Service is authorized and required by law to protect and manage the fish, marine mammals, and other marine resources of the United States, including by enforcing and implementing the MMPA and, with respect to marine species, the ESA. The Service's headquarters and primary office are in Silver Spring, Montgomery County, Maryland.

27.     The Service issued the Seismic Rule and the Biological Opinion. The Service also adopted the environmental review documents challenged here that were prepared by Defendant Bureau of Ocean Energy Management under NEPA.

28.     Defendant National Oceanic and Atmospheric Administration is a federal agency within the Department of Commerce, with its principal offices in Washington, D.C. NOAA has supervisory authority over the Service.

29.     Defendant Gina Raimondo, United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has ultimate responsibility for the administration and implementation of the MMPA and the ESA, and for compliance with all other federal laws applicable to the Department of Commerce. She is sued in her official capacity.

30.     Defendants Coit, the Service, NOAA, and Raimondo are collectively referred to as the "National Marine Fisheries Service Defendants."

31.     Defendant Bureau of Ocean Energy Management ("the Bureau") is an

11

agency within the Department of the Interior. The Bureau is responsible for managing oil, gas, and mineral natural resources on the Outer Continental Shelf. The Bureau is responsible for the permitting and oversight of oil and gas leasing, exploration, and production activities in the Gulf of Mexico. The Bureau issued the Programmatic Environmental Impact Statement and Record of Decision challenged here, and is responsible for ensuring compliance with NEPA and all other federal laws.

32.     Defendant Amanda Lefton is the Director of the Bureau and is the official ultimately responsible for all Bureau activities. She is sued in her official capacity.

33.     Defendant Deb Haaland, Secretary of the United States Department of the Interior, is the highest-ranking official within that Department, and, in that capacity, has ultimate responsibility for the administration and implementation of NEPA and all other applicable federal laws with respect to the Bureau and Interior activities. She is sued in her official capacity.

34.     Defendants Bureau of Ocean Energy Management, Lefton, and Haaland are collectively referred to as the "Bureau of Ocean Energy Management Defendants."

## STATUTORY AND REGULATORY BACKGROUND

35.     To permit seismic surveying in the Gulf, the Service, the Bureau, and their officers must comply with several federal statutes: the ESA, the MMPA, NEPA, and the Administrative Procedure Act (APA), among others.

## I.     Endangered Species Act

36.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153,

12

180 (1978). Congress enacted the ESA because human activities had caused many species to go extinct, and other species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)-(2).

37.     Section 7 of the ESA generally prohibits federal agencies from authorizing, funding, or carrying out any action "likely to jeopardize the continued existence of any endangered species or threatened species." *Id*. § 1536(a)(2). To "jeopardize" a species means to engage in an action that could reduce appreciably the likelihood of survival or recovery. *See* 50 C.F.R. § 402.02.

38.     A federal agency's grant of permits or authorizations is agency action subject to the requirements of Section 7. *Id*. § 402.02(c).

39.     Section 7 of the ESA establishes a consultation process that agencies must follow to fulfill their substantive mandate to avoid jeopardizing endangered or threatened species and adversely affecting their habitat. 16 U.S.C. § 1536(a)(2). Under this process, an agency proposing an action that may affect such species must consult with the National Marine Fisheries Service (for most marine species) or with the U.S. Fish and Wildlife Service (for land-based species) to evaluate the current status of the species and the environmental baseline, as well as the proposed action and its direct, indirect, and cumulative effects. *See* 50 C.F.R. § 402.14(a), (g).

40.     The agency proposing an action subject to the ESA section 7 consultation requirement is termed the "action agency," while the National Marine Fisheries Service or the Fish and Wildlife Service, depending on the species at issue, is termed the "consulting agency." In cases where one of the wildlife agencies is itself taking an

13

action, the agency may be both the "action agency" and the "consulting agency" for the action, with different divisions within the agency engaging in consultation with each other.

41.     The ESA action agencies in this case are the Bureau, which engaged the Service's ESA Interagency Cooperation Division for consultation on its oil and gas program for the Gulf of Mexico; and the Service's Permits and Conservation Division, which engaged the Service's ESA Interagency Cooperation Division for consultation with respect to the Seismic Rule.

42.     As part of the consultation process, the consulting agency must determine whether the action is likely to jeopardize the continued existence of a species or result in the destruction or adverse modification of a species' critical habitat. 16 U.S.C. § 1536(b)(3)-(4); 50 C.F.R. §§ 402.02, 402.14(g)(3)-(4). The consulting agency makes this determination in a document known as a "biological opinion." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1).

43.     A biological opinion must include a summary of the information upon which the opinion is based, and an evaluation of "the current status of the listed species," the "effects of the action," and "cumulative effects." 50 C.F.R. § 402.14(g)(2), (3), (h)(1).

44.     The "environmental baseline" includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early Section 7 consultation, and the impact of State or private

14

actions which are contemporaneous with the consultation in process." *Id.* § 402.02 "Cumulative effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.* The consulting agency must evaluate and determine whether the action, when added to the environmental baseline and together with any cumulative effects, will jeopardize the continued existence of any listed species or destroy or adversely modify any species' critical habitat. *Id.* § 402.14(g)(3)-(4).

45.     During the consultation process, each agency must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

46.     If the consulting agency concludes that an action is likely to jeopardize an endangered or threatened species or destroy or adversely modify critical habitat, it must list "reasonable and prudent alternatives" that would avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

47.     If the consulting agency concludes that an action is not likely to jeopardize an endangered or threatened species or destroy or adversely modify critical habitat, but could "take" listed species (within the meaning of the ESA), then the consulting agency must issue an incidental take statement that (1) describes the amount or extent of anticipated take, (2) specifies reasonable and prudent measures to minimize adverse impacts, and (3) prescribes mandatory terms and conditions for the action. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1).

48.     The ESA defines "take" as "to harass, harm, . . . wound, [or] kill." 16 U.S.C. § 1532(19).

49.     Under Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), it is illegal for any person—including governmental agencies—to take any endangered species except in compliance with an incidental take statement or other authorization.

## II.     Marine Mammal Protection Act

50.     In 1972, Congress enacted the MMPA because "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). Legislative history confirms that Congress intended to build a "conservative bias" into the Act, so that "no steps should be taken regarding these animals that might prove to be adverse or even irreversible in their effects until more is known." H.R. Rep. No. 92-707, at 15 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 4144, 4148.

51.     To protect against further depletion and extinction of these species, the MMPA establishes a "moratorium on the taking . . . of marine mammals." 16 U.S.C. § 1371(a). The term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). "Harassment" includes any act that has the potential to (1) injure a marine mammal or marine mammal stock (referred to as "Level A harassment"), or (2) disturb a marine mammal or marine mammal stock by disrupting behavioral patterns such as migration, breeding, feeding, or sheltering (referred to as "Level B harassment"). *Id.* § 1362(18)(A), (C). All takings of marine mammals (other than those due to certain specific activities not relevant here) are prohibited by the Act. *Id.* § 1371(a).

52.     Under a limited exception to this prohibition, the Service may authorize

the take of marine mammals incidental to a specified activity, under certain circumstances. *Id.* § 1371(a)(5)(A). To authorize such take over a period lasting more than one year, the Service must determine that the activity will take only "small numbers of marine mammals of a species or population stock," *id.* § 1371(a)(5)(A)(i), and that the authorized take will have at most "a negligible impact on such species or stock," *id.* § 1371(a)(5)(A)(i)(I); *see* 50 C.F.R. § 216.103. In addition, if the Service authorizes incidental take under this exception, it must also prescribe "means of effecting the least practicable adverse impact" on the marine mammal species or stock and its habitat. 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa). In making these determinations, the Service must employ "the best scientific evidence available." 50 C.F.R. § 216.102(a); *see* 16 U.S.C. § 1371(a)(5)(A)(i).

### III.   National Environmental Policy Act

53.     NEPA, 42 U.S.C. § 4321 et seq., establishes "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). It declares the federal government's responsibility to act "as trustee of the environment for succeeding generations" and to use "all practicable means" to "assure . . . safe, healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331(b)(1)-(2).

54.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). If an action may have a significant effect on the environment, or if there are substantial questions about whether it may, an agency must prepare an EIS.

55.     Through this mechanism, Congress intended NEPA to serve as "an environmental full disclosure law" that enables the public to "weigh a project's benefits against its environmental costs." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Congress also intended NEPA environmental review to ensure "the integrity of the agency process," forcing agencies to "face" rather than "ignor[e]" "stubborn, difficult-to-answer objections." *Id.* NEPA's core requirement is that agencies "take a 'hard look' at the environmental effects of their planned action[s]" before approving them. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

56.     When a group of actions will occur in the same geographical area, or are similar in timing, impacts, or subject matter, federal agencies may prepare a programmatic EIS to consider the activities together. *See* 40 C.F.R. § 1502.4 (2017).[1] The agency can then incorporate by reference, or "tier to," relevant portions of that programmatic analysis when analyzing the impacts of specific actions within that group of proposed actions. *Id.* §§ 1502.20, 1502.28 (2017). An agency cannot use tiering to avoid taking a hard look at the impacts of specific actions.

57.     An agency may adopt another agency's EIS, but only after undertaking an independent review to ensure the EIS is adequate. *See id.* § 1506.3(a) (2017). An agency's adoption of an inadequate EIS does not satisfy NEPA. *See id.*

---

[1] The Council on Environmental Quality issued revised NEPA regulations in 2020; the new regulations state that they are applicable to "any NEPA process begun after September 14, 2020." 85 Fed. Reg. 43,304, 43,372 (July 16, 2020). The NEPA process which led to the Final PEIS occurred before September 14, 2020, and therefore is subject to the pre-2020 regulations.

58.     After a NEPA process is completed, if the agency becomes aware of new information or the proposed action changes in ways that will affect the environment "in a significant manner or to a significant extent not already considered," the agency is required to prepare a supplemental EIS. *Marsh*, 490 U.S. at 374; *see* 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.9(c)(1) (2017); 40 C.F.R. § 1502.9(d)(1) (2020).

## IV.    Administrative Procedure Act

59.     The APA grants a right of judicial review to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

60.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of procedure required by law." *Id.* § 706(2)(A), (D). The APA grants to a reviewing court the authority to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

## I.     The Gulf of Mexico's Rich Marine Life

61.     The Gulf of Mexico is home to marine species ranging from simple invertebrates to complex and highly evolved fish and marine mammals. The Gulf's diverse and highly complex habitats provide food, shelter, and spawning grounds for marine species at different stages of their life.

62.     Industrial development threatens the existence of many vulnerable species

19

living in the Gulf.

63.     There are 28 species of marine mammals that inhabit the Gulf, including

endangered Bryde's and sperm whales, and threatened West Indian manatees.

64.     The Gulf of Mexico Bryde's whale—recently renamed the Rice's whale to

reflect its status as a separate species—is found nowhere else on earth. The species is a

baleen whale—a large, filter-feeding whale in the same biological order as the

humpback whale, blue whale, and right whale. The Gulf of Mexico Bryde's whale is the

only baleen whale resident in the Gulf of Mexico and is one of the most endangered

whales on the planet. By the government's estimates, only about 50 individuals of this

species remain in existence.

65.      In 2019, the Service listed the Gulf of Mexico Bryde's whale as

endangered throughout its range. 84 Fed. Reg. 15,446, 15,446 (Apr. 15, 2019). The

Service stated that the species was endangered "due to its small population size and

restricted range, and the threats of energy exploration, development and production, oil

spills and oil spill response, vessel collision, fishing gear entanglement, and

anthropogenic noise." *Id*. Similarly, in a 2016 status review for the species, the Service

concluded that the Gulf of Mexico Bryde's whale is at a "high risk of extinction" and

that anthropogenic noise from vessel traffic and seismic exploration threatens the ability

of the species to communicate.

66.     A small, distinct population of sperm whales also resides in the Gulf,

numbering 763 individuals by the Service's estimate. Much of their core habitat occurs

in areas with abundant oil and gas activities. The population is also threatened by

vessel collision, entanglement in fishing gear, and chemical pollution in Gulf waters. Sperm whales are listed as endangered throughout their global range.

67.     Many of the marine mammals affected by the decisions at issue here have not recovered from the 2010 *Deepwater Horizon* oil spill, which extended across thousands of square miles of ocean habitat.

68.     The Deepwater Horizon Trustees, led by staff from NOAA and the Service, concluded that the Gulf of Mexico Bryde's whale would require 69 years—i.e., more than an order of magnitude longer than the period covered by the Seismic Rule— to recover from the effects of the *Deepwater Horizon* oil spill.

69.     Other marine mammal species impacted by the *Deepwater Horizon* disaster include the Gulf's small population of endangered sperm whales (21 years to recovery, by the Trustees' estimate), pygmy killer whales (29 years to recovery), rough-toothed dolphins (54 years to recovery), and spinner dolphins (105 years to recovery). Along the coast, the most profoundly affected marine mammals were small populations of bottlenose dolphins. In all, the Programmatic Damage Assessment found that coastal bottlenose dolphins had suffered high rates of expected excess mortality, excess failed pregnancies, and adverse health outcomes, pointing to an outright loss of as much as 50 percent of these populations.

70.     According to the Service's analysis, all the species noted above would be exposed to the activities authorized under the Seismic Rule, resulting at minimum in repeated disruptions to vital behavior such as foraging and reproduction.

II.     **Seismic Airgun Surveys**

71.     Oil and gas exploration and production in the Gulf of Mexico is extensive. According to the U.S. Department of Energy, federal waters in the Gulf account for about 17 percent of crude oil production in the United States. As of June 2021, there were over 2,000 active oil and gas leases in the Gulf, covering nearly 12 million acres of ocean floor. Over 100 million additional acres remain available for leasing.

72.     The offshore oil and gas exploration and production process begins with mapping to determine the potential presence of oil and gas deposits beneath the ocean floor.

73.     To create these maps, the oil and gas industry typically relies on high-energy seismic airguns, which are towed behind ships in complex arrays and release intense pulses of compressed air into the water about every 10 to 12 seconds. These pulses travel down through the water column, penetrate deep into the seafloor, and rebound to the water's surface where they can be recorded and analyzed.

74.     A typical seismic survey takes place day and night and may continue for days, weeks, or months depending on the size of the survey.

75.     Companies that conduct seismic surveys either sell the resulting data to companies that drill exploration wells or use the data as a basis for their own exploration activities. As a result of the demand for these data, multiple companies may conduct seismic surveys across the same areas of the ocean.

76.     The noise produced by seismic survey airguns is tremendously loud and has far-ranging impacts. A large seismic array can produce effective peak pressure

levels higher than that of virtually any other man-made source, save explosives—more than 250 decibels. Although airguns are vertically oriented within the water column, horizontal propagation is so significant as to make them one of the leading contributors to low-frequency noise thousands of miles from any given survey, masking the calls of baleen whales and other animals that rely on the acoustic environment for breeding and survival.

77.     There are several types of seismic surveys, all of which generate significant low-frequency noise, including: (a) 2D surveys, in which ships cover long track lines with single arrays; (b) 3D surveys, in which ships cover a grid pattern using two arrays that fire in rapid succession; and (c) so-called 4D, or time-lapse, surveys, in which surveys are repeated every several months to note changes in subsurface features over time. In addition, some operators conduct "wide azimuth" surveys, in which multiple ships towing seismic arrays run side-by-side and fire in tandem.

78.     The seismic surveying that the Bureau proposed and the Service authorized is extensive. The Bureau measures seismic surveys in "24-hour survey days." On the Bureau's estimate, seismic surveys will, on average, traverse the Gulf every hour of every day for five years, amounting to about 1,600 combined days of around-the-clock activity.

III.     **Environmental Impacts of Seismic Surveys**

79.     Sound travels extremely efficiently in seawater. Marine mammals and many fish depend on sound for virtually every vital life function—finding mates, foraging, avoiding predators, navigating, and communicating. When loud sounds

pollute the ocean, an essential part of the environment—the audio landscape—is degraded. Some biologists have analogized the increasing levels of noise from human activities to a rising tide of "smog" that has industrialized major portions of the marine environment off our coasts. This acoustic smog is shrinking the sensory range of marine animals by orders of magnitude from pre-industrial levels.

80.     In the Gulf, noise from human activities is particularly intense. "[A]verage ambient noise levels at low frequencies in the northern [Gulf of Mexico] are among the highest measured in the world's oceans." Proposed Rule, 83 Fed. Reg. 29,212, 29,217 (June 22, 2018). "[G]eophysical surveys dominate these high noise levels." *Id.*

81.     The high-intensity pulses produced by airguns can cause a range of impacts on marine mammals, fish, and other marine life, including broad habitat displacement, disruption of vital behaviors essential to foraging and breeding, loss of biological diversity, and, in some circumstances, injuries and mortalities.

82.     The impacts of airgun surveys are felt on an extraordinarily wide geographic scale. Airguns' low-frequency energy can propagate for thousands of miles across the ocean. These sounds overlap most extensively with the frequencies at which baleen and sperm whales are most acoustically sensitive. For these (and other) species, airguns can disrupt essential behaviors over vast areas of the ocean—in some cases 100,000 square kilometers and greater—and across a wide range of behavioral contexts (foraging, breeding, and migrating). Even moderate levels of exposure to airguns have been shown to compromise sperm whales' foraging success on important feeding grounds in the Gulf of Mexico. Such impacts experienced repeatedly and at the

24

geographic scale of populations can accumulate to population-level harm.

83.     Seismic surveys also elevate background levels of noise, masking animal calls and other biologically important signals, and compromising the ability of marine wildlife to communicate, feed, find mates, and engage in other vital behavior. The cumulative acoustic energy from airguns can create virtually continuous noise even at long distances from any single array. In the Gulf of Mexico, seismic surveys can increase the background level of noise across distances of 500 kilometers, according to a recent Service-directed modeling effort. According to a three-year Cornell University monitoring study, noise from seismic airguns dominates the acoustic background of the northern Gulf of Mexico.

84.     A substantial scientific literature documents the biological impacts of seismic surveys on marine mammals. These impacts include, but are not limited to:

a. *Disruption of essential vocalizations.* Seismic airgun noise can cause whales to stop producing vocalizations essential to breeding success, individual and cooperative foraging, predator avoidance, and mother-calf interactions.

b. *Direct disruption of foraging.* Seismic airgun noise can disrupt feeding behavior and significantly reduces foraging success even in whales that are frequently exposed to airgun noise.

c. *Masking and loss of communication space.* Seismic airgun noise can shrink the space in which marine mammals can communicate with members of their own species, interfering over a vast scale with foraging, breeding, mother-calf contact, and other essential behavior. The noise also interferes with the

25

animals' ability to hear other biologically important sounds.

d. *Large-scale habitat avoidance or abandonment*. Seismic airgun noise can displace marine mammals from preferred feeding, breeding, and migratory habitat, over both the short and long term, with potentially serious energetic consequences.

e. *Startle response and sensitization*. Seismic airgun blasts, with their extremely rapid onset time, can induce a startle response, sensitize animals to sound, and cause animals to alter their behavior to avoid sound sources.

f. *Impacts on prey species*. Seismic airgun noise can kill, injure, and disrupt the behavior of marine mammal prey species, from zooplankton to fish.

g. *Temporary and permanent hearing loss*. Seismic airgun noise can induce temporary or permanent hearing loss, impairing the animals' ability to feed, breed, and communicate.

h. *Increased injury and mortality risk*. Seismic airgun noise can exacerbate the risk of marine mammal stranding and vessel collision, of mother-calf separation, and of other mechanisms of injury and mortality.

i. *Physiological stress*. Seismic airgun noise can induce acute and, over time, chronic physiological stress, which may compromise the health of individual marine mammals and reduce reproductive success.

85. For other species, too, the effects of seismic blasting can be devastating. Intense, low-frequency noise, as from seismic surveys, has been shown to damage the internal organs of fish and invertebrates and to disturb, or even wipe out, krill and

zooplankton populations for miles. Long-term exposure to seismic surveys can damage the hearing and sensory abilities of fish and invertebrates. And because these species sit at the foundation of many food chains, these harms can have ecosystem-wide effects.

## THE SERVICE'S AUTHORIZATION OF SEISMIC SURVEYS IN THE GULF

I.     **The Trump Administration's Rulemakings**

   A.     **The Seismic Rule**

86.     On January 19, 2021, the Service published its final Seismic Rule in the Federal Register. 86 Fed. Reg. 5322 (Jan. 19, 2021).

87.     The Seismic Rule responds to a 2016 request, by the Bureau, for the Service to authorize the take of marine mammals under the MMPA during geophysical oil and gas surveys in the Gulf.

88.     The Seismic Rule allows the oil and gas industry to harm and harass marine mammals while conducting seismic surveys in Federal waters in the Gulf of Mexico for five years, beginning April 19, 2021. 86 Fed. Reg. at 5322; *see* 50 C.F.R. § 217.181. Many marine mammals live in these waters, including sperm whales, bottlenose dolphins, and the endangered Gulf of Mexico Bryde's whale. *See* 86 Fed. Reg. at 5389-90; 50 C.F.R. § 217.180. Seismic surveys may occur throughout the Gulf of Mexico, in the Bureau's Western, Central, and Eastern Planning Areas, except in an area in which Congress imposed a moratorium.

89.     This moratorium was imposed by the Gulf of Mexico Energy Security Act of 2006 (GOMESA), which restricted oil and gas leasing until the year 2022 in certain areas in the eastern Gulf of Mexico, including the majority of the Bureau's Eastern

Planning Area and a small portion of its Central Planning Area. On September 8, 2020, the President, acting under the Outer Continental Shelf Lands Act (OCSLA), withdrew the same area covered by the GOMESA moratorium from disposition by leasing for 10 years, beginning July 1, 2022, and ending June 30, 2032. The area covered by the Act and the President's withdrawal (the "GOMESA Moratorium Area") is not covered by the Seismic Rule.

90.     The Rule creates a framework under which prospective seismic surveyors may apply for letters of authorization, which will authorize those companies to harm or harass marine mammals. *See* 50 C.F.R. § 217.186.

91.     The Rule defines the total "take" that all such letters of authorization may collectively authorize. *See* 86 Fed. Reg. at 5357-58. The Rule concludes that this take will collectively have a "negligible impact" on each of the marine mammal species or stocks in the Gulf. *Id.* at 5438; *see* 16 U.S.C. § 1371(a)(5)(A)(i)(I).

92.     Under the Rule, *each* letter of authorization may authorize a seismic surveyor to harm or harass up to *one third* of the species or stock. 86 Fed. Reg. at 5438-39. The Rule deems the take of up to one third of the species to be a "small" amount of take under the MMPA. *Id.* at 5364; 16 U.S.C. § 1371(a)(5)(A)(i).

93.     The Rule requires that seismic surveys use visual and acoustic observation to detect marine mammals, and that surveyors suspend their activities under certain circumstances. The Rule also adopts a limited time-area restriction, along the Gulf Coast, in effect from February to May, to protect bottlenose dolphins in waters most heavily impacted by the *Deepwater Horizon* oil spill.

28

94.     However, the Service rejected almost every mitigation measure, necessary to reduce marine mammal take to negligible levels and to reduce the impacts of the Service's rule to the least practicable levels, that Plaintiffs and the Marine Mammal Commission proposed.

95.     In particular, the Rule does not include any restriction on the total amount of seismic activity that can occur in the Gulf. Nor does the Rule include any requirement that seismic surveys avoid duplicative or unnecessary surveying.

96.     Having omitted those measures, the Rule authorizes essentially the entire suite of seismic surveys proposed by the Bureau, with few to no restrictions on the time, place, and manner of those surveys.

97.     In total, the Rule authorizes seismic surveys that the Service projects will harass and injure whales and dolphins in the Gulf 1.75 *million* times each year, or 8.7 million times over five years.

**B.     The Biological Opinion**

98.     The Service and Bureau began an ESA consultation process following the *Deepwater Horizon* disaster.

99.     The consultation was stalled for years and took more than a decade to complete. In its final form, the consultation covers the entirety of the Bureau's oil and gas program in the Gulf of Mexico, including seismic survey activities.

100.    In the latter half of 2017, the Service decided to include seismic survey activities within the scope of the Biological Opinion.

101.    In 2018, the Service sent the action agencies a full draft biological opinion.

102.    In 2019, the Service sent the action agencies a second draft opinion.

103.    On February 24, 2020, the Bureau modified the proposed action to exclude the GOMESA Moratorium Area.

104.    On March 13, 2020, the Service's Office of Protected Resources issued a "Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico" (the "Biological Opinion").

105.    According to the Service, the actions covered by the Biological Opinion include the Bureau of Ocean Energy Management's and the Bureau of Safety and Environmental Enforcement's "Oil and Gas Program" for the Outer Continental Shelf in the Gulf of Mexico and the Service's Seismic Rule and subsequent issuance of any letters of authorization.

106.    In the Biological Opinion, the Service concluded that that the proposed actions considered, including the Bureau's Oil and Gas Program and the Service's Seismic Rule, are likely to jeopardize the continued existence of the endangered Gulf of Mexico Bryde's whale.

107.    In reaching its conclusion that the proposed actions would jeopardize the Gulf of Mexico Bryde's whale with extinction, the Service's Biological Opinion found that sound from seismic surveys would result in auditory injury to and harassment of individual Gulf of Mexico Bryde's whales.

108.    The Biological Opinion found that under the proposed actions, as modified by the Bureau, individual Gulf of Mexico Bryde's whales "would be

30

repeatedly exposed" to sound from seismic surveys each year, and "chronically exposed to such levels over the 50-year period." This "high level of exposure" from seismic surveys, the Biological Opinion stated, is "expected to negatively affect the fitness of at least some individuals through masking and/or chronic stress responses."

109.    The Service further stated in the Biological Opinion that it "expect[s] all Bryde's whales will experience chronic exposure to sounds associated with seismic activity. Such exposure is expected to result in chronic stress in some individuals, which may have impacts on health and ultimately fitness." Further, the Biological Opinion stated, "[c]hronic exposure to seismic sound is also expected to interfere with Bryde's whale communication and mask important biological cues, which is expected to negatively affect the fitness of individual Bryde's whales by interfering with individuals' abilities to find mates and disrupting mother-calf communication."

110.    The Biological Opinion stated that it also "expect[s] the entire population to be chronically exposed to sound levels that would mask important biological and environmental sounds and result in chronic stress of individuals, both of which are expected to impact the fitness of at least some individuals in the population."

111.    The Biological Opinion concluded that, primarily due to these exposure levels, the proposed actions would "reduce the numbers and reproduction of Gulf of Mexico Bryde's whales."

112.    Given the "extremely small" population of Gulf of Mexico Bryde's whales existing in the wild, the Biological Opinion stated that "any effects that are expected to reduce the fitness of individuals or result in mortality are of great concern."

113.    The Biological Opinion found that the Service "expect[s] that all individual Gulf of Mexico Bryde's whales not killed by vessel strikes associated with the proposed action (or by other means) are likely to experience chronic stress and behavioral disruption associated with noise from the proposed action, significant masking, and hearing loss, all of which are expected to reduce the fitness of individuals by reducing their reproduction and/or survival."

114.    The Biological Opinion examined the exposures to seismic noise and other effects of the proposed Service and Bureau actions and concluded that "the entire small, isolated [population] of Gulf of Mexico Bryde's whales is expected to experience a reduction in fitness from combined stressors resulting from the proposed action."

115.    Given the "wide-ranging, combined multiple effects to the small and likely declining population," the Biological Opinion concluded that the proposed Service and Bureau actions are "likely to jeopardize the continued existence" of the Gulf of Mexico Bryde's whale under the ESA.

C.    **The Bureau's Programmatic Environmental Impact Statement**

116.    In 2013, the Bureau announced its intent to prepare a Programmatic Environmental Impact Statement covering geological and geophysical activities in the Gulf of Mexico. 78 Fed. Reg. 27,427 (May 10, 2013).

117.    The Bureau issued a Draft Programmatic Environmental Impact Statement in 2016. 81 Fed. Reg. 67,380 (Sept. 30, 2016).

118.    The Bureau issued its Final Programmatic Environmental Impact Statement ("the Final PEIS") in August 2017. *See* 82 Fed. Reg. 36,418 (Aug. 4, 2017).

119.     The Final PEIS covers both the Bureau's proposed action in issuing permits or authorizations for geological and geophysical activities in the Gulf of Mexico; and the Service's proposed action in promulgating an incidental take regulation, i.e., the Seismic Rule, and issuing any letters of authorization or incidental harassment authorizations pursuant to that Rule.

120.     The Service adopted the Final PEIS as its NEPA analysis when it issued the Seismic Rule.

121.     The Bureau issued a Record of Decision (ROD) on November 30, 2020. *See* 85 Fed. Reg. 78,359 (Dec. 4, 2020).

122.     The Bureau did not revise the Final PEIS between August 2017 and the issuance of the ROD in November 2020. The Bureau's ROD states that "[t]here are no new circumstances, information, or changes in the action or its impacts that would require supplementation of the Programmatic EIS." To date, the Bureau has not revised the Final PEIS.

## The Service's Seismic Rule Is Unlawful

### I.     The Service's Flawed Small Numbers Analysis

123.     Under the statutory exemption that the Service invoked in issuing the Seismic Rule, the Service may allow an activity to take marine mammals only if the agency determines that the activity will harm or harass only a "small number[]" of marine mammals and have only a "negligible impact" on the species. 16 U.S.C. § 1371(a)(5)(A)(i); *see also* 50 C.F.R. § 216.106.

124.     In the Rule, the Service concluded that seismic surveying in the Gulf over

the next five years would take only a "small number" of marine mammals and would have a "negligible impact" on those species. Those conclusions were based on a series of errors.

### A.   A third of a species is not a "small" number.

125.   In the Rule, the Service established that, with respect to *each* subsequent individual authorization, it would construe any take amounting to less than 34 percent of an entire marine mammal species or population as "small." It did so on the grounds that the phrase "small number" supposedly implies both "medium" and "large" numbers as its corollaries, and then ascribed equal fractions of one-third to each category. 86 Fed. Reg. at 5364; *see also id.* at 5439-40.

126.   One-third (or 33 percent) of an entire species or population is not a "small number" within the meaning of the MMPA.

### B.   The Service's small numbers analysis is unlawful because it did not assess *all* take authorized under the Rule.

127.   The MMPA requires that the Service ensure that the "specified activity" within the region results in the "taking" of "small numbers of marine mammals of a species or population stock." 16 U.S.C. § 1371(a)(5)(A)(i).

128.   The Service defined the applicable "specified activity" as "a broad program of geophysical survey activity that could occur at any time of year in U.S. waters of the GOM." 86 Fed. Reg. at 5426. Thus, in the context of the Service's Seismic Rule, this means that the Service must limit the taking of marine mammals by seismic

surveys in the Gulf of Mexico to "small numbers."

129.    Instead, the Seismic Rule will allow *each* seismic survey to take up to one third of each species or stock of marine mammals each year.

130.    The Service's interpretation allows each individual survey in the Gulf to harm or harass one-third of each species population each year, and to harm or harass as much as 140% of the entire population (five-thirds) over five years.

131.    Over the five-year period of the Seismic Rule, therefore, the entire set of seismic surveys authorized by the Rule may, taken together, harm or harass many times the total population of marine mammal species or stocks.

132.    The Service acknowledged that its Seismic Rule will result in extraordinarily large numbers of marine mammal take.

133.    By the Service's own estimates, the Seismic Rule authorizes seismic surveys to take sperm whales 60,000 times, even though only 763 sperm whales live in the Gulf. In other words, individual sperm whales could be harassed or injured close to 100 times. The Service authorized seismic surveys to take the approximately 223 beaked whales more than 750,000 times. Each individual beaked whale could therefore be harassed or injured more than 3,000 times. The Service will allow seismic surveys to take every single one of the remaining Gulf of Mexico Bryde's whales at least once.

134.    The levels of take authorized by the Rule far exceed the "small numbers" of takes that the statute allows.

**C.     The Service's small-numbers calculations arbitrarily excluded take due to "masking."**

135.     Seismic surveys increase the background level of loud noise in the ocean, which can "mask" other sounds and prevent animals from hearing them. This masking has multiple deleterious impacts on marine mammals and other wildlife.

136.     The Service has recognized that masking constitutes "take" for purposes of the MMPA. The Service has stated that "when [a] coincident (masking) sound is man-made, it may be considered harassment when disrupting or altering critical behaviors." Proposed Rule, 83 Fed. Reg. at 29,239.

137.     Despite acknowledging that seismic testing will mask sounds and by doing so "take" marine mammals, the Service did not quantify how many times this would occur. The Service thus omitted take from masking in its small-numbers assessment.

138.     The Service's small-numbers assessment therefore relied on a level of take inconsistent with the Service's own findings concerning the amount of take that it was authorizing in the Seismic Rule.

139.     For some species, the effects of masking are particularly devastating: For example, the Service expects that *all* individual Gulf of Mexico Bryde's whales are likely to experience "significant masking"—i.e., MMPA take—which will reduce individual whales' fitness, reproduction, and survival.

140.     While the Service has not revealed the exact number of predicted Gulf of Mexico Bryde's whale takes due to masking, that number is at least as large as the entire

population. Take of "every individual" member of a species is not take of a "small number" of that species.

141.    The Service failed to calculate the number of marine mammal takes due to masking and failed to analyze the consequences of omitting those instances of harm or harassment from its calculations.

## II.    The Service's Flawed Negligible-Impact Analyses

### A.    The Service's analysis was illogical.

142.    The Seismic Rule states that five years of seismic airgun blasting in the waters of the Gulf of Mexico will have a "negligible impact" on the Gulf's many marine mammal species—that is, that the permitted seismic surveying "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103.

143.    To support its negligible-impact analysis, the Service considered both the absolute number of takes as well as "other factors, such as the type of take, the likely nature of any behavioral responses (e.g., intensity, duration), the context of any such responses (e.g., critical reproductive time or location, migration), as well as effects on habitat, and the likely effectiveness of mitigation." 86 Fed. Reg. at 5426.

144.    The Service conducted this analysis using a "risk assessment framework" that purports to "put into biologically-relevant context the level of potential risk of injury and/or disturbance to marine mammals." *Id.*

145.    This framework was developed by an environmental working group commissioned by the Service and published in a companion document called the Expert

Working Group Report ("EWG Report").

146.    In relying on the EWG Report to reach its negligible-impact conclusions, the Service made a foundational logical error.

147.    The EWG Report attempts to assess the relative risk to several species across seven zones in the Gulf. Within each zone, the Report assesses the relative severity of seismic activity and the relative vulnerability of species. The Report then synthesizes severity ratings and vulnerability ratings to generate relative risk ratings for each species in each zone. The EWG Report estimates likely impacts under two different modeled activity levels—a "high" seismic-survey activity model, and a "low" activity model.

148.    For example, in a high activity year, the Gulf of Mexico Bryde's whale receives a "low" risk rating in Zones 1 and 2, and "very high" risk ratings in Zones 5 and 6 (and no rating at all in zones 3, 4, and 7, because of the lack of anticipated activity in those zones).

149.    In its negligible-impact analysis, the Service took those zone-specific ratings and averaged them to reach a Gulf-wide risk assessment for each species. 86 Fed. Reg. at 5430 & tbls. 14, 15. The Service "used the median of the seven zone-specific risk ratings" to "describe a GOM-wide risk rating" for each species, under each activity scenario. 86 Fed. Reg. at 5430.

150.    Species abundance varies across these zones. In other words, the species are not distributed equally across these zones.

151.    By relying on median risk ratings across all zones, rather than the zone-

38

specific ratings, the Service did not account for differences in species abundance in different zones.

152.    The Service's reasoning fails to provide a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This failure rendered the Service's analysis arbitrary and capricious.

**B.    Gulf of Mexico Bryde's whale**

153.    In the final Seismic Rule, the Service concluded that authorizing seismic surveys under the rule would have a negligible impact on the Gulf of Mexico Bryde's whale.

154.    In the Biological Opinion, the Service concluded that the authorized seismic surveys would affect the fitness, reproduction, and survival of the Gulf of Mexico Bryde's whale, contribute to jeopardizing its continuing existence, and negatively impact every individual whale.

155.    The Service's modeling in the Seismic Rule indicated that seismic survey noise will "take" 7 to 10 individual Gulf of Mexico Bryde's whales every year for the five years of the Seismic Rule.

156.    In the Seismic Rule, however, the Service stated that the absence of seismic survey activity within the species' "core habitat area"—a region which largely overlaps with the GOMESA Moratorium Area and is outside the scope of the surveys analyzed in the Biological Opinion and authorized by the Seismic Rule—meant that "the impacts of the expected takes from these activities are not likely to adversely affect" the species.

86 Fed. Reg. at 5434. That conclusion was unsupported by and inconsistent with the Service's own analyses.

C.    **Sperm Whale**

157.    In its Biological Opinion, the Service concluded that sperm whales' population would decline due to impacts to individual whales and the "potential for multiple and high level of exposures."

158.    The Biological Opinion anticipated that seismic surveys will harass sperm whales more than 32,000 times per year. Individual sperm whales will be, according to the Biological Opinion, "repeatedly exposed to sound levels" that cause a "temporary threshold shift in hearing," i.e., temporary hearing loss, "and/or behavioral disturbance sound levels from geological and geophysical surveys within a single year."

159.    Such repeated harassment, the Biological Opinion concluded, "is expected to negatively affect the body condition of sperm whales and ultimately the fitness of at least some individuals through lost foraging opportunities and/or chronic stress."

160.    In the Seismic Rule, however, the Service concluded that the impact to sperm whales of repeated harassment would be negligible. In reaching that conclusion, the Seismic Rule entirely ignores the Biological Opinion's contrary analysis.

161.    The Seismic Rule attempted to justify this conclusion by pointing to a study that modeled potential impacts from seismic surveys to sperm whales in the Gulf under six different sets of assumptions. Under most of those modeled scenarios, the study anticipated that seismic surveying would have a significant impact on sperm whales' relative body condition. But in the Seismic Rule, the Service said that, "under

realistic modeled scenarios," predicted declines in body condition "were not significant." 86 Fed. Reg. at 5361-62. The Service never explained what distinguishes the scenario it considered "realistic" from the many others under which significant harm to sperm whales is expected to occur.

162.     The Service failed to provide a "rational connection between the facts found and the choice made" to support the Seismic Rule's conclusion that the impact to sperm whales of repeated harassment would be negligible. *State Farm*, 463 U.S. at 43.

## III.   The Service's Failure to Consider and Impose Adequate Mitigation Measures

163.     The MMPA requires the Service to prescribe "permissible methods of taking . . . and other means of effecting the least practicable adverse impact on such species or stock and its habitat." 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa).

164.     In the Seismic Rule, the Service rejected several potential mitigation measures necessary to reduce marine mammal take to negligible levels and to reduce the impacts of the Service's rule to the least practicable levels. In particular, the Service rejected capping the total amount of seismic activity; prohibiting duplicative seismic surveys; and requiring companies to engage in collaborative surveys to eliminate duplicative surveys harmful to marine mammals.

165.     The Service did not conduct an analysis as to whether these three mitigation measures were "practicable," as the statute requires.

166.     Instead, the Service incorrectly stated that it lacks authority to implement those mitigation measures. The Service relied on an incorrect interpretation of the MMPA and OCSLA to deflect its responsibility for considering whether these

41

mitigation measures were practicable and would reduce adverse impacts on marine mammal species.

167.    The Service also did not impose any specific mitigation measures to protect the Gulf of Mexico Bryde's whale, including by reducing the number, intensity, frequency, or timing of seismic surveys outside its core habitat. For example, in its 2020 Biological Opinion, the Service determined that noise from seismic surveys, in combination with other effects of the Bureau's and the Service's actions, would likely jeopardize the existence of the Gulf of Mexico Bryde's whale. Nonetheless, the Service refused to prescribe any methods for seismic surveys or other restrictions that would reduce the impact from seismic surveys to this species.

### The Service's Proposed Reasonable and Prudent Alternative in the Biological Opinion Is Unlawful

168.    Because the Service found that the proposed actions considered in the Biological Opinion are likely to cause jeopardy to the Gulf of Mexico Bryde's whale, it proposed a "Reasonable and Prudent Alternative" for the species (the "Service's Alternative").

169.    The Service's Alternative "implements a nighttime closure and 10 knot or less speed restriction during the day year-round to all oil and gas program related vessels for the program duration" in an area of the Gulf of Mexico Bryde's whale habitat defined in the Biological Opinion.

170.    The Service concluded that even after excluding the GOMESA Moratorium Area from the Bureau's proposed action, seismic surveys authorized under

the Bureau's plan and by the Seismic Rule would contribute to jeopardizing the Gulf of Mexico Bryde's whale by adversely affecting the fitness, reproduction, and survival of the whales.

171.    Despite its findings of clear harm from seismic surveys, the Service did not include in its Alternative any restrictions or reductions in the level of seismic surveys or issuance of letters of authorization. The Service's Alternative contains no restrictions on the number, location, or timing of such surveys.

172.    Due to these deficiencies, the Service's Alternative will not reduce any of the harms to the fitness, reproduction, and survival of the Gulf of Mexico Bryde's whale caused by the noise from seismic surveys.

173.    In concluding that the proposed action, as modified by the Service's Alternative, would "not likely jeopardize the continued existence of the Gulf of Mexico Bryde's whale," the Service failed to analyze or otherwise acknowledge the fact that the Service's Alternative contains no measures to reduce the effects of noise from seismic surveys on the species. The Service did not analyze whether seismic survey noise would result in jeopardy to the species if the Service's Alternative were implemented. The Service did not consider that "every individual" Gulf of Mexico Bryde's whale would be taken due to the masking effects of seismic noise even if the Service's Alternative were implemented. The Service arbitrarily concluded, without explanation, that the Service's Alternative would prevent jeopardy despite not reducing the amount of seismic survey activity under the proposed actions.

## The Bureau's Programmatic EIS Is Unlawful

174.     The Bureau signed the Final PEIS in August 2017. The Bureau and the

Service have adopted the Final PEIS for their respective actions. The Final PEIS has not

been amended or supplemented since it was issued.

**I.      The Bureau and the Service were required to supplement the PEIS based on new information in the Biological Opinion.**

175.     The Final PEIS analyzed the "fitness level consequences" of exposures to

noise from seismic surveys. In doing so, the Final PEIS reached several conclusions that

have since been contradicted by the Service's Biological Opinion. Neither the PEIS nor

the Biological Opinion reconciles these inconsistencies.

176.     For the Gulf of Mexico Bryde's whale, the Final PEIS concluded, with

respect to Level A harassment (injury), that only a "small number of individuals []

might experience repeated exposures" and that "it is not anticipated that any animal

would experience fitness-level impacts from Level A exposures." For Level B

harassment (disturbance), the Final PEIS stated that "[i]t is not anticipated that animals

would be exposed for extensive durations, and therefore would not have fitness-level

consequences." The Final PEIS further stated that "there are multiple factors that

indicate the potential for repeated exposures is unlikely to result in reduced fitness in

individuals or populations." In its conclusions regarding fitness, the Final PEIS stated

that "[t]he likelihood of fitness effects to individuals from potential exposures [to

seismic noise] is considered minimal" and that "the continued viability of the local

populations or stocks will not be threatened if actual impacts were to occur, and the

44

annual rates of recruitment or survival of the local populations or stocks will not be seriously affected."

177.    The Biological Opinion presents significant new information and conclusions relating to the Gulf of Mexico Bryde's whale that directly contradict the information and conclusions in the Final PEIS.

178.    The new information in the Biological Opinion includes the Service's prediction, based on its models, that every member of the whale's population is "likely to experience chronic stress and behavioral disruption associated with noise from the proposed action, significant masking, and hearing loss, all of which are expected to reduce the fitness of individuals by reducing their reproduction and/or survival"; as well as the Service's conclusion that the Bureau's Oil and Gas Program for the Gulf of Mexico and the Service's own Seismic Rule are likely to jeopardize the existence of the species.

179.    The Bureau issued the PEIS in August 2017. The Service issued the Biological Opinion in March 2020. The Bureau issued its Record of Decision adopting the PEIS in November 2020, some eight months after issuance of the Biological Opinion. The Service adopted the PEIS when it finalized the Seismic Rule in January 2021, ten months after the issuance of the Biological Opinion.

180.    The Bureau was aware of the information in the Biological Opinion when it signed its Record of Decision adopting the PEIS.

181.    The Service was aware of the information in the Biological Opinion when it adopted the Final PEIS as its own NEPA document for the Seismic Rule.

182.     Neither the Bureau nor the Service conducted any updated NEPA analysis to reflect the information in the Biological Opinion prior to taking their respective actions. Nor have they concluded any such analysis to date. Neither agency has ever presented the information in the Biological Opinion to the public for comment as part of a NEPA process.

**II.     The PEIS ignored information about Gulf of Mexico Bryde's whales.**

183.     In addition to the new information in the Biological Opinion, the Bureau and the Service have also failed to consider information in the Service's possession about the presence of Gulf of Mexico Bryde's whales outside of the whale's "core" habitat and outside the GOMESA Moratorium Area.

184.     The Service uses underwater microphones—passive acoustic monitoring devices called hydrophones—to monitor the presence of marine mammals and other wildlife.

185.     Since about the year 2016, the Service's scientists have detected the presence of Gulf of Mexico Bryde's whales on recordings from an array of hydrophones off the coast of Mississippi, Louisiana, and Texas, outside the GOMESA Moratorium Area and the area that the Service refers to as the Gulf of Mexico Bryde's whale's "core area." In particular, on the Service's western-most hydrophone off Texas, the Service detected Gulf of Mexico Bryde's whale calls on 16 percent of days during monitoring between about June 2016 to about May 2017.

186.     Those recordings confirm that Gulf of Mexico Bryde's whales regularly live in and transit areas along the shelf break from Florida to Texas. They further

confirm that Gulf of Mexico Bryde's whales live in and transit areas outside of the "core" area where the Service and Bureau have assumed the population is confined.

187.    The analysis in the Final PEIS assumes that in Zone 5—an area offshore of Louisiana and Mississippi west of the GOMESA Moratorium Area—only 1 Gulf of Mexico Bryde's whale is present. Zone 5 spans the shelf break where the Service's hydrophone recordings indicate that these whales regularly live and transit. Zone 5 is also one of the regions "projected to encompass the majority of deep penetration airgun seismic survey activities" allowed under the Seismic Rule.

188.    The Final PEIS's modeling is directly contradicted by data that has been in the Service's possession since about the year 2016. The Service was aware of the presence of Gulf of Mexico Bryde's whales in areas off the Louisiana and Texas coast at the time the Final PEIS was published, and at the time it adopted the Final PEIS in its Seismic Rule.

189.    The Service and the Bureau work in close coordination on matters relating to oil and gas development in the Gulf of Mexico. On information and belief, the Bureau was also aware of the data regarding the presence of Gulf of Mexico Bryde's whales in areas off the Louisiana and Texas coast at the time the Final PEIS was published.

190.    The Service withheld the information about the presence of Gulf of Mexico Bryde's whales in areas off the Louisiana and Texas coast from the public during the time period when the Final PEIS, Biological Opinion, the Bureau's Record of Decision, and the Seismic Rule were in publication and (in the case of the NEPA analysis and the Seismic Rule) subject to public comment. The Service has yet to

47

disclose the full extent of its understanding of the presence and density of Gulf of Mexico Bryde's whales outside the GOMESA Moratorium Area based on the hydrophone recordings and other data.

191.    Neither the Bureau nor the Service conducted any updated NEPA analysis to reflect the information related to the presence of Gulf of Mexico Bryde's whales outside the GOMESA Moratorium Area prior to taking their respective actions. Nor have they conducted any such analysis to date. Neither agency has ever presented the information related to the presence of Gulf of Mexico Bryde's whales outside the GOMESA Moratorium Area to the public for comment as part of a NEPA process.

**FIRST CLAIM FOR RELIEF:**
**Arbitrary, Capricious, and Unlawful ESA Biological Opinion**
(By Plaintiffs NRDC, Healthy Gulf, AZA, and Surfrider,
Against National Marine Fisheries Service Defendants)

192.    Plaintiffs incorporate by reference all preceding paragraphs as if fully stated herein.

193.    When the Service concludes that a proposed action is likely to jeopardize the continued existence of a listed species, the ESA requires the Service to propose a reasonable and prudent alternative that will mitigate the proposed action so as to avoid the likelihood of jeopardy and therefore bring the proposed action into compliance with the ESA. 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14(h)(2).

194.    The Biological Opinion concluded that the Bureau and the Service's proposed actions, specifically including the Bureau's and Service's actions relating to seismic surveys, are likely to jeopardize the Gulf of Mexico Bryde's whale.

195.    The Service's Alternative contains no restrictions, limitations, or other mitigating conditions for seismic surveys.

196.    The Biological Opinion found that noise from seismic surveys under the Bureau and the Service's proposed actions will cause "chronic stress and behavioral disruption," "significant masking," and "hearing loss" in Gulf of Mexico Bryde's whales, which will reduce individual fitness, reproduction, and survival. The Service's Alternative will not reduce the effects of noise from seismic surveys on Gulf of Mexico Bryde's whales in any way.

197.    The Service arbitrarily concluded that its Alternative would avoid jeopardy to the Gulf of Mexico Bryde's whale despite its findings elsewhere in the Biological Opinion about the effects on fitness, reproduction, and survival of individual whales due to seismic noise and its contribution to the Service's finding of jeopardy to the existence of the species.

198.    The Service's Alternative and its conclusion that its Alternative would avoid the likelihood of jeopardy to the Gulf of Mexico Bryde's whale from the noise effects of seismic surveys are arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA, 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF:**
**Unlawful Action Contrary to the MMPA and APA**
(By All Plaintiffs Against National Marine Fisheries Service Defendants)

199.    Plaintiffs incorporate by reference all preceding paragraphs as if fully stated herein.

49

200.    The MMPA allows the Service to authorize only the take of "small numbers of marine mammals of a species or population stock." 16 U.S.C. § 1371(a)(5)(A)(i).

201.    In the Seismic Rule, the Service erroneously interpreted that provision to allow *each* seismic survey to take *each year* up to one third of a given species or stock.

202.    One third of an entire population is not a "small number" of marine mammals. Some Gulf marine mammal populations number in the tens of thousands of individuals.

203.    The Service's authorization of surveys that, cumulatively, could take more than the entire population of species and stocks of marine mammals violated the MMPA's small-number limitation.

204.    The levels of take authorized by the Service each year and over the five years of the Seismic Rule are greater than the "small numbers" of marine mammals that the statute allows to be taken; the authorized take levels are arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

205.    The Service concluded that noise from seismic testing that results in the masking of sounds in a manner detrimental to marine mammal hearing constitutes "take" under the MMPA, but did not account for the number of instances of take due to masking when it made its "small numbers" findings. The Service's discounting of take due to masking and its failure to offer a reasoned explanation for excluding masking from its take estimates was arbitrary, capricious, an abuse of discretion, and not in

accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

206.    The MMPA also requires the Service to prescribe "permissible methods of taking . . . and other means of effecting the least practicable adverse impact on such species or stock and its habitat." 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa).

207.    Noise from seismic surveys will adversely impact marine mammal species in the Gulf of Mexico.

208.    Nonetheless, the Service refused to impose as mitigation measures (i) capping the total amount of seismic activity; (ii) prohibiting duplicative seismic surveys; or (iii) requiring companies to engage in collaborative surveys to eliminate duplicative surveys harmful to marine mammals.

209.    Each of those potential mitigation measures would have reduced the adverse impact of noise from seismic surveys on the species.

210.    The Service failed to determine whether any of these three mitigation measures were practicable.

211.    In rejecting each of these three proposed mitigation measures, the Service incorrectly stated that it lacks authority under the MMPA to prescribe such measures.

212.    Each of these three measures is within the Service's statutory authority.

213.    Each of these three measures is practicable.

214.    The Service found that noise from seismic surveys threatens the fitness, reproduction, and survival of the Gulf of Mexico Bryde's whale, and that seismic survey noise will impact every member of the species' population.

215.    Nonetheless, the Service failed to prescribe any mitigation measures—

such as limitations on timing, intensity, frequency, or location—on seismic surveys that would reduce their impact on the Gulf of Mexico Bryde's whale.

216.   The Service also failed to impose any mitigation measures to protect the Gulf of Mexico Bryde's whale by reducing seismic noise in areas outside the whale's "core" habitat area.

217.   Mitigation measures to reduce the adverse impact of seismic surveys on the Gulf of Mexico Bryde's whale were within the Service's statutory authority.

218.   Mitigation measures to reduce the adverse impact of seismic surveys on the Gulf of Mexico Bryde's whale are practicable.

219.   The Service's failure to prescribe mitigation measures to cap the total amount of seismic activity, prohibit duplicative seismic surveys, require companies to engage in collaborative surveys, and limit the impacts on Gulf of Mexico Bryde's whales violates the MMPA's least-practicable-adverse-impact requirement.

220.   The Service's decision not to impose these mitigation measures lacks reasoned explanation.

221.   The Service's statements that it lacks authority to implement these mitigation measures is based on an incorrect and unreasonable interpretation of the MMPA.

222.   To authorize take under the Seismic Rule, the Service was also required to find that the total taking of each species or stock of marine mammals under the rule will have a "negligible impact." 16 U.S.C. § 1371(a)(5)(A)(i)(I).

223.   The Service concluded that the total take under Seismic Rule will have a

negligible impact on the endangered Gulf of Mexico Bryde's whale. But that conclusion is belied by its findings that the Seismic Rule will lead to seismic survey noise that threatens the fitness, reproduction, and survival of individual whales and the species, and result in jeopardy to the species' existence. The Service's conclusion is undermined by its own findings and data and lacks reasoned explanation.

224.    The Service's negligible impact analysis also relied on a foundational logical error—averaging the EWG Report's zone-specific ratings without regard for the geographic distribution of marine mammals throughout the Gulf.

225.    The Service's promulgation of the Seismic Rule is arbitrary, capricious, and an abuse of discretion; not in accordance with the MMPA or its implementing regulations; and violates the APA, 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF:**
**Violation of NEPA**
(By All Plaintiffs Against Bureau of Ocean Energy Management Defendants)

226.    Plaintiffs incorporate by reference all preceding paragraphs as if fully stated herein.

227.    NEPA requires that federal agencies prepare supplemental analyses where there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996); 40 C.F.R. § 1502.9(c)(1)(ii) (2017); *accord* 40 C.F.R. § 1502.9(d)(1) (2020). Agencies may also first prepare a review that considers whether new information is of such importance as to

require a supplemental analysis.

228.    In the August 2017 Final PEIS, the Bureau concluded that geological and geophysical seismic surveys would have "minimal" fitness effects on Gulf of Mexico Bryde's whales, that the "continued viability" of the species "will not be threatened," and that recruitment and survival "will not be seriously affected."

229.    The March 2020 Biological Opinion directly contradicted the Final PEIS. In the Biological Opinion, the Service concluded that all individual Gulf of Mexico Bryde's whales are "likely to experience chronic stress and behavioral disruption associated with noise from the proposed action, significant masking, and hearing loss, all of which are expected to reduce the fitness of individuals by reducing their reproduction and/or survival," that the entire population of the species "is expected to experience a reduction in fitness," and that the proposed actions were "likely to jeopardize the continued existence" of the species.

230.    The publication of these conclusions in the Biological Opinion presented significant new circumstances or information relevant to environmental concerns that triggered NEPA's requirement that the Bureau supplement the Final PEIS.

231.    The Final PEIS also failed to consider information relating to the presence of Gulf of Mexico Bryde's whales in the central and western Gulf of Mexico. That information constituted significant new circumstances or information relevant to environmental concerns that also triggered NEPA's requirement that the Bureau supplement the Final PEIS.

232.    The Bureau issued its Record of Decision without completing a

supplemental environmental analysis. It failed to consider whether a supplemental analysis was required in light of the information in the Biological Opinion and the information about the presence of Gulf of Mexico Bryde's whales in the central and western Gulf of Mexico. The Final PEIS and the Bureau's Record of Decision should be held unlawful and set aside.

233.    By failing to supplement its outdated PEIS and continuing to rely on a PEIS that fails to meet the standards laid out in NEPA, its implementing regulations, and governing precedent, the Bureau unlawfully withheld agency action and its Record of Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law in violation of NEPA, 42 U.S.C. § 4332; 40 C.F.R. § 1502.9(c)(1)(ii) (2017); 40 C.F.R. § 1502.9(d)(1) (2020), and the APA, 5 U.S.C. §§ 701–706.

**FOURTH CLAIM FOR RELIEF**
**Violation of NEPA**
(By All Plaintiffs Against National Marine Fisheries Service Defendants)

234.    Plaintiffs incorporate by reference all preceding paragraphs as if fully stated herein.

235.    The Service issued its final Seismic Rule without completing a supplemental environmental analysis. It failed to consider whether a supplemental analysis was required in light of the information in the Biological Opinion and the information about the presence of Gulf of Mexico Bryde's whales in the central and western Gulf of Mexico. The Seismic Rule should be held unlawful and set aside.

236.    By failing to supplement the outdated PEIS and continuing to rely on a

PEIS that fails to meet the standards laid out in NEPA, its implementing regulations, and governing precedent, the Service unlawfully withheld agency action and its Seismic Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law in violation of NEPA, 42 U.S.C. § 4332; 40 C.F.R. § 1502.9(c)(1)(ii) (2017); 40 C.F.R. § 1502.9(d)(1) (2020), and the APA, 5 U.S.C. §§ 701–706.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Defendants violated the Endangered Species Act;

B.    Declare that Defendants violated the Marine Mammal Protection Act;

C.    Declare that Defendants violated the National Environmental Policy Act;

D.    Declare that Defendants violated the Administrative Procedure Act;

E.    Vacate the Biological Opinion;[2]

F.    Vacate the Seismic Rule;

G.    Vacate the PEIS;

H.    Vacate the Bureau's November 30, 2020 Record of Decision;

---

[2] Plaintiffs do not challenge, and disclaim any prayer for vacatur or other relief directed at, (a) any permit for conducting a seismic survey in the Gulf of Mexico issued by the Bureau prior to June 3, 2021, and/or (b) any action by any permittee, taken prior to or subsequent to June 3, 2021, implementing a permit, issued prior to June 3, 2021, to conduct a seismic survey in the Gulf of Mexico.

I.      Enjoin Defendants from authorizing take of marine mammals incidental to seismic airgun blasting for purposes of oil and gas exploration in the Gulf of Mexico unless and until Defendants comply with the law;

J.      Grant Plaintiffs their costs of suit, including reasonable attorneys' fees to the extent authorized by law; and

K.      Grant Plaintiffs such further relief as the Court deems just and proper.

Dated: July 22, 2021

Respectfully submitted,


 /s/ Peter J. DeMarco
Peter J. DeMarco (D. Md. Bar No. 19639)
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6267
Facsimile: (415) 795-4799
Email: pdemarco@nrdc.org

Michael Wall
(PHV application forthcoming)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Telephone: (415) 875-6100
Facsimile: (415) 875-6161
Email: mwall@nrdc.org

Gabriel Daly
(PHV application forthcoming)
Natural Resources Defense Council
20 West 40th Street
New York, NY 10011
Telephone: (212) 727-4671
Facsimile: (415) 795-4799
Email: gdaly@nrdc.org

Adeline S. Rolnick*
(PHV application forthcoming)
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6240
Facsimile: (415) 795-4799
Email: arolnick@nrdc.org
*Admitted only in New York, supervised by
Gabriel Daly, a member of the D.C. Bar

Counsel for Plaintiffs Natural Resources Defense Council, Inc. and
American Association of Zoological Parks and Aquariums Inc.

John C. Keeney, Jr. (D. Md. Bar No. 01344)
General Counsel
Association of Zoos & Aquariums
8403 Colesville Road, Suite 710
Silver Spring, MD 20910-3314
Telephone: (301) 244-3361
Facsimile: (301) 562-0888
Email: jkeeney@aza.org

Of counsel to American Association of Zoological Parks and Aquariums Inc.


  /s/ Christopher Gowen
Christopher Gowen (D. Md. Bar No. 18511)
(signed by Peter J. DeMarco with permission of Christopher Gowen)
Gowen Silva & Winograd PLLC
513 Capitol Court, NE, Suite 100
Washington, DC 20002
Telephone: (202) 380-9355
Facsimile: (202) 499-1370
Email: cgowen@gowensilva.com

Miyoko Sakashita
Kristen Monsell
(PHV applications forthcoming)
Center for Biological Diversity
1212 Broadway #800
Oakland, CA 94612
Telephone: (510) 844-7100

Emails: miyoko@biologicaldiversity.org; kmonsell@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

  /s/Christopher D. Eaton
Christopher D. Eaton (D. Md. Bar 21544)
(signed by Peter J. DeMarco with permission of Christopher D. Eaton)
Stephen D. Mashuda
(PHV application forthcoming)
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
Telephone: (206) 343-7340
Facsimile: (415) 217-2040
Emails: ceaton@earthjustice.org; smashuda@earthjustice.org

Brettny Hardy
(PHV application forthcoming)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Telephone: (415) 217-2000
Facsimile: (415) 217-2040
Email: bhardy@earthjustice.org

*Counsel for Plaintiffs Healthy Gulf and Surfrider Foundation*